**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CAMPAIGN LEGAL CENTER,<br><br>*Plaintiff,*<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>*Defendant.* |

Civil Action No. 24-2585 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

This case involves an advertisement related to the 2024 U.S. Senate race in Montana. Starting in September 2023, about nine months before the primary election, a political action committee (PAC), Last Best Place PAC, began running this advertisement attacking Tim Sheehy, then a Republican primary candidate. In February 2024, Campaign Legal Center filed an administrative complaint with the Federal Election Commission (FEC) claiming that the PAC had violated the Federal Election Campaign Act (FECA) by failing to report various independent expenditures connected with the advertisement. Although the FEC's Office of General Counsel recommended that the FEC find reason to believe that the PAC had violated FECA, the FEC ultimately dismissed the administrative complaint. The FEC concluded that the advertisement did not expressly advocate for the election or defeat of a clearly identified candidate. Campaign Legal Center now challenges that dismissal, claiming that it was contrary to law in violation of FECA. While the FEC's dismissal was based on a permissible interpretation of the statute, the reasons it provided for its dismissal were too conclusory, rendering the dismissal arbitrary or capricious. The Court therefore grants summary judgment to Campaign Legal Center.

## BACKGROUND

### A.    Statutory and Regulatory Background

"Congress enacted the Federal Election Campaign Act to remedy actual and perceived corruption in the electoral process." *Campaign Legal Ctr. v. FEC*, 106 F.4th 1175, 1178 (D.C. Cir. 2024). With that goal in mind, FECA establishes certain disclosure requirements for individuals and organizations spending money in connection with federal elections. *Id.* It requires "[e]ach treasurer of a political committee" to periodically "file reports of receipts and disbursements" with the FEC. 52 U.S.C. § 30104(a)(1). These reports sometimes must include reference to what are called "independent expenditures." *See, e.g.*, *id.* § 30104(b)(4)(H)(iii). For example, "any political committee other than an authorized committee" must disclose all "independent expenditures." *Id.* And these non-authorized committees must also provide the name and address of each person who receives any disbursement aggregating over two hundred dollars within a certain time frame "in connection with an independent expenditure by the reporting committee[.]" *Id.* § 30104(b)(6)(B)(iii).

FECA also requires more immediate reporting of large independent expenditures. *See id.* § 30104(g). "A person (including a political committee) that makes or contracts to make independent expenditures aggregating $10,000 or more at any time up to and including the 20th day before the date of an election shall file a report describing the expenditures within 48 hours." *Id.* § 30104(g)(2). And after the twentieth day preceding the election up until twenty-four hours before the election, those who make independent expenditures "aggregating $1,000 or more" "shall file a report describing the expenditures within 24 hours." *Id.* § 30104(g)(1).

FECA defines "independent expenditure" to mean "an expenditure by a person . . . (A) expressly advocating the election or defeat of a clearly identified candidate; and (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the

candidate's authorized political committee, or their agents, or a political party committee or its agents." *Id.* § 30101(17). And the FEC has promulgated regulations providing two standards by which a communication might qualify as express advocacy. *See* 11 C.F.R. § 100.22. First, a communication expressly advocates if it uses particular phrases, "such as 'vote for the President,' 're-elect your Congressman,' 'support the Democratic nominee,'" or the like. *Id.* § 100.22(a). Second, a communication expressly advocates if, "[w]hen taken as a whole and with limited reference to external events, such as proximity to the election," it "could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because . . . (1) [t]he electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (2) [r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action." *Id.* § 100.22(b).

"Any person who believes a violation of [FECA] has occurred . . . may file a complaint with the [FEC]." 52 U.S.C. § 30109(a)(1). If the FEC determines "by an affirmative vote of 4 of its members" that "it has reason to believe that a person has committed, or is about to commit, a violation of [FECA], the [FEC] shall, through its chairman or vice chairman, notify the person of the alleged violation." *Id.* § 30109(a)(2). The FEC will find "reason to believe" where a complaint "credibly alleges" that a significant FECA violation "may have occurred[.]" FEC, *Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process*, 72 Fed. Reg. 12,545, 12,545 (Mar. 16, 2007). And any "party aggrieved" by the FEC's dismissal of a complaint may seek judicial review in the U.S. District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8)(A).

### B.    Factual Background

On February 14, 2024, Campaign Legal Center and an individual filed an administrative complaint with the FEC against Last Best Place PAC. Admin. R. (AR) at 1–14, ECF No. 20. The administrative complaint was designated MUR 8216. *Id.* at 1. And it alleged that Last Best Place PAC violated 52 U.S.C. § 30104 and FEC regulations by paying millions of dollars for advertisements attacking U.S. Senate candidate Tim Sheehy without "accurately and timely report[ing] its independent expenditures[.]" *Id.* at 8–11. More specifically, the complaint alleged that the PAC began running the advertisements against Sheehy, then "a Republican primary candidate for the U.S. Senate in Montana," shortly after forming in September 2023. *Id.* at 1–3. And according to the complaint, the PAC "violated its reporting obligations by failing to file a 48-hour report for each of its independent expenditures, and by failing to disclose and itemize its independent expenditures on its 2023 year-end report." *Id.* at 8.

The administrative complaint alleged that from September 5, 2023, to December 31, 2023, Last Best Place PAC "disbursed $2,029,549.32—nearly all of its reported disbursements—to 'Mountain Media,' a vendor that reportedly purchased airtime for [Last Best Place] PAC's ads and shares the same address as . . . an Alexandria, Virginia-based media buyer that 'works with many Democratic campaigns.'" *Id.* at 3–4 (citations omitted). To support its claim of undisclosed independent expenditures, the complaint identified a particular advertisement that the Court will refer to as "Shady Sheehy," which allegedly "not only attacked Sheehy but specifically referred to his campaign for the U.S. Senate and clearly advocated against his election[.]" *Id.* at 4. The advertisement said the following:

> They got a home loan and paid it back. She got a car loan and paid it back. But this multimillionaire got an over-$770,000 government loan and never paid it back. But Tim Sheehy doesn't think he should be held accountable. Sheehy got rich off government contracts, walked away from his loan, and now, he and his campaign

can spend millions trying to buy our Senate seat. Shady Sheehy. He's just out for himself.

*Id.* (emphasis omitted) (citing "Shady Sheehy," https://host2.adimpact.com/admo/#/ viewer/36ffda2b-a32a-4a7d-84b5-e8363d3a96e6/). According to the administrative complaint, the Last Best Place PAC did not file a 48-hour independent expenditure report disclosing its payments for this advertisement, nor did it disclose any independent expenditures in its 2023 year-end report. *Id.* at 10–11. Quite the opposite, that year-end report said that "[t]he committee's media and advertising disbursements were not for independent expenditures." *Id.* at 4.

On April 5, 2024, the Last Best Place PAC filed a written response with the FEC, denying the allegations in the administrative complaint. *Id.* at 22–26. It argued that "Shady Sheehy" was not an independent expenditure because it did not contain express advocacy. *Id.* at 22. It explained that the advertisement worked to "bring[] awareness to and comment on matters of public concern: specifically, how the Paycheck Protection Program benefitted wealthy corporations and the corrosive impact of wealth in politics." *Id.* at 23 (citation omitted). Without a more explicit direction to take electoral action, "the electoral portion of the Advertisement [was] *not* unmistakable, unambiguous, and suggestive of only one meaning, and reasonable minds *could* differ as to whether the Advertisement encourage[d] actions to elect or defeat Mr. Sheehy or some other kind of action." *Id.* at 25 (emphasis in original).

On May 17, 2024, the FEC's Office of General Counsel recommended that the FEC find reason to believe that the Last Best Place PAC had violated FECA. *Id.* at 27–29; *see also id.* at 53 (date). It specifically pointed to provisions requiring the disclosure and reporting of independent expenditures. *See id.* at 29 (citing 52 U.S.C. § 30104(b), (g); 11 C.F.R. §§ 104.3(b)(3)(vii), 104.4(a), 104.4(b)(2)). It reached this conclusion after deciding that "Shady Sheehy" met both standards for express advocacy under 11 C.F.R. § 100.22. *See* AR at 38–50. It determined that

"Shady Sheehy" met the first standard because it used "the personally denigrating term 'shady,'" "explicitly refer[red] to Sheehy as a candidate," and "include[d] video of Sheehy on the campaign trail[.]" *Id.* at 38–40. And it thought the advertisement met both elements of the second standard as well. *Id.* at 42–50. As to the first element, it believed "[t]he electoral portion of [the] ad [was] clear." *Id.* at 42. And it offered three reasons why "[r]easonable minds could not differ as to whether [the advertisement] encourage[d] actions to defeat Sheehy and not some other action." *Id.* at 43–50; *see also* 11 C.F.R. § 100.22(b)(2).

First, the Office of the General Counsel pointed to the "personally denigrating label 'Shady Sheedy'" in combination with the fact that Sheehy "has never held public office" to argue that the advertisement must have been directed at Sheehy's candidacy and not any separate public policy or officeholder issue. *Id.* at 43–44. Second, it rejected the argument that the timing of the advertisement was dispositive and also pointed out that nothing suggested the advertisement had stopped running. *Id.* at 47–48. And third, it applied the standard for the functional equivalent for express advocacy articulated in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), explaining why that standard compelled its conclusion. AR at 48–50.

On July 11, 2024, the FEC failed to approve the Office of the General Counsel's recommendation. *Id.* at 81. That same day, the FEC voted 4-2 to dismiss the complaint. *See id.* at 82. About a month later, on August 6, 2024, the four Commissioners who voted to dismiss the complaint issued a Statement of Reasons for their decision. *Id.* at 83–89. They explained that they believed "Shady Sheehy" did not meet either standard for express advocacy. *See id.* at 87–88. The FEC notified the Plaintiff by letter on August 16, 2024, that it had dismissed the complaint and closed the file. *Id.* at 91. And on September 6, 2024, the two dissenting Commissioners issued their own Statement of Reasons, explaining why they believed "Shady

Sheehy" amounted to express advocacy under 11 C.F.R. § 100.22(b) and therefore "should have [been] reported . . . as [an] independent expenditure[]." AR at 92–97.

### C.    Procedural Background

On September 9, 2024, the Plaintiff filed a Complaint in this Court, alleging that the FEC's "failure to find reason to believe that [FECA] violations occurred and its dismissal of [the] Plaintiff's administrative complaint were arbitrary, capricious, and contrary to law." *Id.* ¶ 86 (citing 52 U.S.C. § 30109(a)(8)(A); *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986)). The FEC filed an Answer on November 18, 2024, denying the Plaintiff's claim. *See* Answer, ECF No. 8. On January 16, 2025, the Plaintiff filed a Motion for Summary Judgment. *See* Pl.'s Mot. Summ. J., ECF No. 13. The FEC responded by filing a Cross-Motion for Summary Judgment. *See* Def.'s Cross-Mot. Summ. J., ECF No. 14. These motions are fully briefed and ripe for review. *See* Def.'s Opp'n to Mot. for Summ. J., ECF No. 18; Pl.'s Reply Supp. Mot. Summ. J., ECF No. 16; Pl.'s Opp'n to Cross-Mot. for Summ. J., ECF No. 15; Def.'s Reply Supp. Cross-Mot. Summ. J., ECF No. 19.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d. at 67 (citations omitted).

**DISCUSSION**

The Plaintiff claims that the FEC's dismissal of MUR 8216 was contrary to law. *See* Compl. ¶¶ 84–86 (citing 52 U.S.C. § 30109(a)(8)(A); *Orloski*, 795 F.2d at 161); Pl.'s Mot. Summ. J. at 16–26. "A dismissal is contrary to law if it is the 'result of an impermissible interpretation of the Act' or 'if the [Commission's] dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion.'" *Campaign Legal Ctr.*, 106 F.4th at 1190 (quoting *Orloski*, 795 F.2d at 161) (citations omitted). The Court finds that the FEC did not rest its decision on an impermissible interpretation of the Act. But the FEC nevertheless acted arbitrarily or capriciously by failing to adequately explain its dismissal. The dismissal was therefore contrary to law in violation of FECA.

**A.    Impermissible Interpretation**

The Plaintiff first argues that the FEC's dismissal "rested on an impermissible and unreasonable construction of the statutory term 'express advocacy' that falls well outside the bounds of the FEC's interpretative discretion[.]" Pl.'s Mot. Summ. J. at 17. In its view, the FEC "wholly invented" a "'temporal proximity' requirement for express advocacy." *Id.* at 21. It reads the FEC as "adopting what amounts to a categorical, timing-based exception to the express advocacy standard"—an exception that "creates an obvious and unjustifiable loophole in the Act's disclosure provisions." *Id.* at 25. It says that this temporal "requirement is not grounded in FECA, nor is it supported by relevant judicial authority or FEC precedent." *Id.* at 21. And it concludes that the FEC's "refus[al] to regulate [the Last Best Place PAC's] ads as independent expenditures because the ads started running 'too far' in advance of the relevant election" "seriously frustrates the statutory disclosure policy the FEC is required to implement." *Id.*

But the FEC introduced no such temporal requirement. It merely considered the fact that the challenged advertisement began running about nine months before the primary election when

deciding whether it amounted to express advocacy. *See* AR at 88. It explained that in past express advocacy matters, the FEC had "relied on the proximity of the ad to the election, in part, to provide . . . critical context." *Id.* And it stated that it was "unaware of Commission precedent finding express advocacy for a character attack ad this long before the relevant election." *Id.* But even while musing on this lack of temporal proximity, the FEC was careful to say that "there is no bright line rule on timing." *Id.* Rather, it explained that it is harder to establish express advocacy "the further an ad is run from a given election." *Id.* This cannot be read as a temporal requirement.

And the FEC's observation about timing is based on a permissible interpretation of FECA. 52 U.S.C. § 30101(17) provides:

> The term 'independent expenditure' means an expenditure by a person . . . (A) *expressly advocating* the election or defeat of a clearly identified candidate; and (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

*Id.* (emphasis added). This statutory text did not come from a vacuum. "The disclosure provisions for independent expenditures were originally written more broadly, to cover any expenditures made 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *FEC v. Furgatch*, 807 F.2d 857, 860 (9th Cir. 1987). Then the Supreme Court worried that this broad language would have a chilling effect on protected speech, so it read the disclosure provisions to apply only to "funds used for communications that 'expressly advocate the election or defeat of a clearly identified candidate.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 79 (1976)). "Congress' later revision of the Act . . . directly adopted the 'express advocacy' standard of *Buckley* into [52 U.S.C. § 30101(17)]." *Id.* (citing H.R. Rep. No. 1057, 94th Cong., 2d Sess. 38 (1976), U.S. Code Cong. & Admin. News. 1976, p. 929, reprinted in Legislative History of the Federal Election Campaign Act Amendments of 1976, 1032 (GPO 1977)).

Several courts have held that the "express advocacy" standard requires looking at the temporal proximity between a communication and the relevant election. *See, e.g.*, *FEC v. Christian Coalition*, 52 F. Supp. 2d 45, 61 (D.D.C. 1999) (saying an explicit directive must be "considered in the context of the entire communication, including its temporal proximity to the election"); *Furgatch*, 807 F.2d at 865 ("Our conclusion is reinforced by consideration of the timing of the ad."); *cf. FEC v. Christian Action Network, Inc.*, 110 F.3d 1049, 1054 (4th Cir. 1997) (describing the consideration of "the timing of the communication in relation to the events of the day" without disapproval). And those that have disagreed have relied on an interpretation of *Buckley* that has since been repudiated by the Supreme Court. *See Maine Right to Life Comm., Inc. v. FEC*, 914 F. Supp. 8, 10–13 (D. Me. 1996) (holding 11 C.F.R. § 100.22(b) was "beyond the power of the FEC" because *Buckley* restricted the standard "to communications containing express words of advocacy of election or defeat"—words captured by 11 C.F.R. § 100.22(a)—thereby making a world where "what is issue advocacy a year before the election may become express advocacy on the eve of the election" "sufficient evidence of First Amendment 'chill'"), *aff'd*, 98 F.3d 1 (1st Cir. 1996); *but see The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 550 n.2 (4th Cir. 2012) ("In 2001, we held that § 100.22(b) was unconstitutional . . . . But this conclusion can no longer stand, in light of *McConnell* [*v. FEC*, 540 U.S. 93 (2003)] and *Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. 449 (2007)."); *Free Speech v. FEC*, 720 F.3d 788, 795 (10th Cir. 2013) ("*Citizens United* [*v. FEC*, 558 U.S. 310 (2010)] directly contradicts Plaintiff's argument that the definition of express advocacy set forth in subsection (b) is overly broad with respect to disclosure requirements."). The FEC is therefore in good company when considering temporal proximity, even without any deference afforded to its statutory interpretation.

The Plaintiff also appears to be challenging the FEC's interpretation of one of its own regulations, 11 C.F.R. § 100.22(b). *See* Pl.'s Mot. Summ. J. at 17 (saying the ad qualified as independent expenditures "[u]nder the plain terms of the express advocacy standard at 11 C.F.R. § 100.22(b)"); *id.* at 18–19 (arguing that the challenged ad satisfies both parts of the "express advocacy standard at section 100.22(b)"); *id.* at 21 (challenging "the dismissing Commissioners' Statement of Reasons assert[ing] that the ads did not contain express advocacy under section 100.22(b)"); *id.* at 22 ("Nor does the timing rationale applied here find any support in prior Commission enforcement matters interpreting 11 C.F.R. § 100.22(b)"). This regulation fleshes out one meaning of "express advocacy." *See* 11 C.F.R. § 100.22(b). It provides:

> Expressly advocating means any communication that . . . [w]hen taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because . . . (1) the electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (2) reasonable minds could differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

*Id.*

The Plaintiff specifically takes issue with how the FEC interpreted the second prong of this regulatory standard. *See* Pl.'s Mot. Summ. J. at 21. The FEC stated that "it is axiomatic that the further an ad is run from a given election, the more likely that reasonable minds could differ about whether the ad constitutes an 'exhortation to vote for or against a specific candidate.'" AR at 88 (quoting *Furgatch*, 807 F.2d at 864). According to the Plaintiff, "[t]he Commissioners' Statement of Reasons thus effectively invented and applied a new legal requirement: For a communication to meet the section 100.22(b) standard—*i.e.*, for a communication to be the 'functional equivalent of express advocacy'—a communication lacking section 100.22(a)'s 'magic words' must be disseminated in closer temporal proximity to the election in which the clearly identified candidate

is running." Pl.'s Mot. Summ. J. at 21. It reads the Statement of Reasons as "effectively requiring that a character attack ad be run shortly before an election to qualify as the functional equivalent of express advocacy[.]" *Id.* at 23.

But as the Court has already explained, the FEC introduced no such temporal requirement, even going so far as to say that "there is no bright line rule on timing," AR at 88. And the FEC was correct to interpret 11 C.F.R. § 100.22(b) as implicating questions of timing for a few reasons. First, the  regulation itself says that communications should be assessed "with limited reference to external events, such as the proximity to the election[.]" *Id.* This suggests that timing is an appropriate, albeit non-dispositive, factor to be considered. Second, the FEC took inspiration from the Ninth Circuit's "context-sensitive approach to 'express advocacy'" in *Furgatch* when it drafted the regulation. *Christian Coalition*, 52 F. Supp. 2d at 61 ("[T]he FEC promulgated a regulation that quotes, and in some instances extends, *Furgatch*[, 807 F.2d 857]." (citing 11 C.F.R. § 100.22 (1999)). And *Furgatch* itself said that its conclusion that an advertisement was express advocacy when it was run "less than a week before the election" was "reinforced by consideration of the timing of the ad." 807 F.2d at 865. Third, the Supreme Court has since introduced a similar standard to define what counts as "the functional equivalent of express advocacy" for First Amendment purposes. *See Wisconsin Right to Life, Inc.*, 551 U.S. at 469–70 ("[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."). And while it said that temporal proximity to an election was not on its own "enough to prove that [an] ad is the functional equivalent of express advocacy"—at least in the context of a statutory requirement for ads run in the sixty days leading up to an election—it also did not reject that it was a factor worth considering. *Id.* at 472. Indeed, it even cautioned that "when it comes to defining

what speech qualifies as the functional equivalent of express advocacy[,] . . . we give the benefit of the doubt to speech, not censorship." *Id.* at 482.

The Court is particularly wary of second-guessing the FEC's interpretation of its own regulations. Under *Orloski*, courts are "especially deferential when a plaintiff challenges the FEC's interpretation of its own regulations and not whether an FEC rulemaking violates FECA or the Constitution." *Hagelin v. FEC*, 332 F. Supp. 2d 71, 76 (D.D.C. 2004) (citations omitted), *rev'd and remanded on other grounds*, 411 F.3d 237 (D.C. Cir. 2005); *see also Buchanan v. FEC*, 112 F. Supp. 2d 58, 70 (D.D.C. 2000) ("Deference is particularly appropriate in this case because it involves the FEC's interpretation of its own regulations."). And this sort of deference survives *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), since it concerns an agency's interpretation of its own regulations rather than that of a statute. *See Battineni v. Mayorkas*, 752 F. Supp. 3d 195, 207 n.3 (D.D.C. 2024) ("While the D.C. Circuit does not appear to have addressed this question, other circuits have concluded that *Loper Bright*'s concern with statutory interpretation does not impact the deference afforded to agencies interpreting their own regulations." (collecting cases)); *Barber v. Emmert*, No. 23-cv-2465, 2025 WL 870364, at *5 n.10 (D.D.C. 2025) ("*Auer* deference is separate and survived *Chevron*'s overruling[.]" (citations omitted)).

Nothing suggests that deference would be inappropriate here. *See Kisor v. Wilkie*, 588 U.S. 558, 574–79 (2019). First, any lack of "genuine ambigu[ity]" cuts in favor of the FEC since the Court has already used the "traditional tools" of construction to conclude that the regulation contemplates the consideration of timing. *Id.* at 574–75. Accordingly, the FEC's interpretation that "it is axiomatic that the further an ad is run from a given election, the more likely that reasonable minds could differ about whether the ad constitutes an exhortation to vote for or against a specific

candidate," AR at 88 (cleaned up), is "reasonable," *Kisor*, 588 U.S. at 575. Second, "the character and context of the agency interpretation entitles it to controlling weight," *id.* at 576, because "[t]he Supreme Court has held that the FEC is 'precisely the type of agency to which deference should presumptively be afforded,'" *Orloski*, 795 F.2d at 164 (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981)). Third, the Statement of Reasons counts as the FEC's "authoritative" or "official position." *Kisor*, 588 U.S. at 577; *see also Campaign Legal Ctr. v. FEC*, No. 22-cv-3319, 2023 WL 6276634, at *6 (D.D.C. Sept. 26, 2023) (calling a statement of reasons from a member of the controlling block "an official statement"). Fourth, the FEC's interpretation "implicate[s] its substantive expertise." *Id.* at 577; *see also Orloski*, 795 F.2d at 164 ("[T]he FEC has been vested by Congress with primary and substantial responsibility for administering and enforcing [FECA], . . . [and] [it] has the sole discretionary power to determine in the first instance whether or not a civil violation of the Act has occurred." (cleaned up)); *cf. Citizens for Resp. & Ethics in Wash. v. FEC*, 209 F. Supp. 3d 77, 87 (D.D.C. 2016) (saying "implementation choices" "call on the FEC's special regulatory expertise"). And fifth, the Statement of Reasons reflects the FEC's "fair and considered judgment"—it is not "an agency construction 'conflict[ing] with a prior' one." *Kisor*, 588 U.S. at 579 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)). Indeed, the Statement of Reasons cites several past enforcement actions that considered, "in part," "the proximity of the ad to the election." AR at 89 (collecting cases). So even if the Court found the regulation ambiguous, the FEC would still be afforded deference.

The Plaintiff argues that it is "not 'axiomatic' that an ad disseminated several months before an election is necessarily more susceptible to differing interpretations about its electoral message than an ad run in the weeks before an election." Pl.'s Mot. Summ. J. at 23 (quoting AR at 88). And it cites as support for this proposition several previous FEC determinations finding that

ads run months before an election satisfied 11 C.F.R. § 100.22(b). *See id.* at 22 (collecting cases). But the fact that those ads satisfied the standard despite their lack of relative temporal proximity does not mean that temporal proximity is irrelevant. Perhaps those ads would have satisfied the standard even more readily had they been run close to their respective elections. Once again, the Plaintiff's argument rests on its reading of the Statement of Reasons as introducing a temporal *requirement* instead of reiterating a temporal *factor*. But the FEC did no such thing. *See* AR at 88 ("[T]here is no bright line rule on timing.").

### B. Arbitrary or Capricious

The Plaintiff next argues that the FEC's dismissal was arbitrary or capricious. *See* Pl.'s Mot. Summ. J. at 16–17 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under *Orloski*, "the Court applies the arbitrary-and-capricious standard of review provided by the APA." *Campaign Legal Ctr. v. FEC*, 646 F. Supp. 3d 57, 63 (D.D.C. 2022) (citing 5 U.S.C. § 706(2)(A)); *see also Citizens for Resp. & Ethics in Wash. V. FEC*, 892 F.3d 434, 437 n.3 (D.C. Cir. 2018) ("In *Orloski* . . . , the court repeated this language from the APA, stating that the Commission would have acted 'contrary to law' if its dismissal of a complaint 'was arbitrary or capricious, or an abuse of discretion.'" (citing *Hagelin*, 411 F.3d at 242). And "[t]he arbitrary and capricious standard of the APA 'mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.'" *Iaccarino v. Duke*, 327 F. Supp. 3d 163, 177 (D.D.C. 2018) (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). "Put simply, an agency 'must explain why it chose to do what it did[,] . . . and conclusory statement will not do.'" *Id.* (quoting *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)).

The FEC's Statement of Reasons does not allow the Court to evaluate its rationale for dismissal. The FEC concluded that the challenged advertisement was not express advocacy because it did not meet the bar set by 11 C.F.R. § 100.22(b), which extends only to communications that "have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question." AR at 88. It explained that temporal proximity was one factor worth considering when deciding how reasonable minds might interpret an advertisement. *See id.* ("In prior express advocacy matters involving attacks on a candidate's character, the Commission has relied on the proximity of the ad to the election, *in part*, to provide . . . context [for whether reasonable minds could differ]." (emphasis added)); ("While there is no bright line rule on timing, it is axiomatic that the further an ad is run from a given election, the more likely that reasonable minds could differ about whether the ad constitutes an exhortation to vote for or against a specific candidate." (cleaned up)). And it reasoned that temporal proximity cut against the Plaintiff in this case. *See id.* ("We are unaware of Commission precedent finding express advocacy for a character attack ad this long before the relevant election.").

But the FEC never identified any other factors that it considered when deciding that there was some other "reasonable meaning than to encourage actions to elect or defeat the candidate in question." *Id.* This despite reiterating there was "no bright line rule on timing." *Id.* After discussing timing, it just said that "[g]iven the high standard for finding express advocacy[,] . . . we conclude that the ads here do not reach this high bar." *Id.* The FEC's Statement of Reasons was therefore too conclusory to survive arbitrary-and-capriciousness review. *See, e.g.*, *Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 66 (D.D.C. 2013) ("[T]he decision fails to explain *why* an inference of bias is unreasonable[.]"). Indeed, by discussing no factors other than timing, it seemed to apply the very bright line rule it expressly disclaimed, which was itself arbitrary or capricious. *See Allentown*

*Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 375 (1998) ("Reasoned decisionmaking, in which *the rule announced is the rule applied*, promotes sound results, and unreasoned decisionmaking the opposite." (emphasis added)).

The FEC insists that it considered more than just timing. *See* Def.'s Reply Supp. Cross-Mot. Summ. J. at 7. It points out that it "reviewed the ad's content to conclude that it did not contain any of the so-called 'magic words' that constitute express advocacy under [S]ection 100.22(a)." *Id.* (citing AR at 87). And it explains that it "further assessed the ad's content to determine that it met the first part of the two-pronged test for express advocacy under [S]ection 100.22(b)[.]" *Id.* (citing AR at 88 & n.25). But the Plaintiff challenges the FEC's application of the *second* part of the 11 C.F.R. § 100.22(b) standard. *See* Pl.'s Mot. Summ. J. at 18–19. So this is not a winning argument for the FEC.

Perhaps the FEC was persuaded that the challenged advertisement "brings awareness to and comment on matters of public concern," like "how the Paycheck Protection Program benefitted wealthy corporations and the corrosive impact of wealth in politics." AR at 23. But there is no way to know without the FEC saying so. "It is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). Nor may courts "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The FEC will be free to provide that sort of explanation on remand. *See* 52 U.S.C. § 30109(a)(8)(C).

## REMEDY

"If the reviewing court determines that the FEC acted 'contrary to law' in dismissing the FEC complaint, then the court may order the agency to 'conform with such declaration within [thirty] days[.]'" *Free Speech for People v. FEC*, No. 22-cv-666, 2024 WL 3617481, at *2

(D.D.C. Aug. 1, 2024) (quoting 52 U.S.C. § 30109(a)(8)(C)). This is exactly what the Plaintiff has requested. *See* Pl.'s Mot. Summ. J. at 26 ("[T]he Court should remand this matter to the FEC with instructions to conform to the Court's order within thirty days."). And it is the relief that the Court will provide.

**CONCLUSION**

For the foregoing reasons, the Court grants the Plaintiff's Motion for Summary Judgment, ECF No. 13, and denies the FEC's Cross-Motion for Summary Judgment, ECF No. 14.

A separate order will issue.

_____<br>
SPARKLE L. SOOKNANAN<br>
United States District Judge

Date:   June 26, 2025